In re GRAND JURY SUBPOENA (Addressed to Robert T. Spano, and Addressed to Parkside Motors, Inc.).

GJP No. 92–26.

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 22, 1992.

———

Philip H. Lauro, Springfield, Mass., for petitioner Spano.

Vincent Bongiorni, Springfield, Mass., for petitioner Parkside Motors.

Andrea S. Paterson, U.S. Dept. of Justice, Washington D.C., for the U.S.

## ORDER

BOLINE, United States Magistrate Judge.

Before the Court are Petitioners' motions to quash two subpoena duces tecum under Federal Rules of Criminal Procedure 17(c) (Fed.R.Crim.P.). Based on all the files, records, memoranda, and arguments of counsel in this matter, IT IS HEREBY ORDERED,

1) Petitioner SPANO'S MOTION TO QUASH/MODIFY on grounds of overbreadth is DENIED.

2) Petitioner SPANO'S MOTION TO QUASH/MODIFY on FIFTH AMENDMENT grounds is GRANTED but only with respect to his required records, as those records are identified in the accompanying memorandum.

3) Petitioner SPANO'S MOTION TO QUASH/MODIFY on FIFTH AMENDMENT grounds with respect to records that are not "required records," as those records are identified in the accompanying memorandum is HELD IN ABEYANCE for ten days. Petitioner SPANO shall have TEN (10) DAYS from the date of this order to demonstrate, through the submission of *in camera* evidence and briefs of counsel, that his act of producing his general and subsidiary ledgers, cash receipts journals, cash disbursements journals, and sales journals would be both testimonial and incriminating in accordance with the attached Memorandum.

4) Petitioner PARKSIDE MOTORS, INC. MOTION TO QUASH/MODIFY on grounds of overbreadth is DENIED.

5) Petitioner PARKSIDE MOTORS, INC. MOTION TO QUASH/MODIFY on FIFTH AMENDMENT ground is DENIED.

MEMORANDUM ATTACHED.

## MEMORANDUM

Before the Court are two motions to quash two subpoenas duces tecum under Federal Rules of Criminal Procedure 17(c)

(Fed.R.Crim.P.). One motion is brought by a sole proprietor of a automobile dealership, Robert T. Spano, the other by the sole shareholder of a corporate automobile dealership, Francis Connor. For reasons discussed below, this Court concludes that Petitioner Spano's motion to quash the subpoena must be granted on grounds that it violates his Fifth Amendment rights against self-incrimination; but that Petitioner Parkside Motor's Inc. motion to quash on those same grounds must be denied.

## I. Background

On June 12, 1992, two subpoenas duces tecum to produce records before the grand jury were served: one upon Robert T. Spano, (Spano) d/b/a/ Supreme Auto Sales, Springfield Massachusetts, the other upon Parkside Motors, Inc. (Parkside). Spano operates as sole proprietor of Supreme Auto Sales, while Parkside, Inc. is a closely-held Massachusetts corporation with a single shareholder—one Francis Connor. (Spano Memo at page 3, Parkside Memo at page 1, respectively).

The subpoenas issued pursuant to an investigation into odometer tampering by certain used car dealers conducted through the Department of Justice, Consumer Litigation Division. Odometer tampering is a violation of 15 U.S.C. § 1984. The documents requested by the subpoenas were for the period from January 1, 1987 through the date of the request and represented six broad categories: 1) information on dealership structure, ownership, and employees including payroll/personnel records; 2) dealership licenses and related documents; 3) financial, banking, and accounting records; 4) telephone records; 5) lawsuits; 6) and all documents required by law or necessarily associated with the purchase or sale of any car.[1]

The Parkside subpoena was directed to the "Custodian of Records." Parkside was incorporated by Connor who also holds the titles of President, Treasurer, and Clerk.

Parkside asserts that it presently has no employees other than Connor, although the Government argues that the company has agents, if not actual employees. (*See* Government's Supplemental Filing in Opposition to Motion to Quash [Gov't Supp. Memo] at page 1–2, and Exhibit 1). Parkside admits that it has had employees in the past, but not "for a substantial period of time." (Parkside Memo, Affidavit of Francis Connor).

Counsel for both parties agreed to postpone the subpoena return date until August 12, 1992. On July 13, 1992, counsel for both Spano and Parkside filed nearly identical motions to quash or limit the subpoena claiming that the subpoenas impermissibly infringed on their Fifth Amendment rights and were "overly broad." The parties subsequently agreed to limit the scope of the subpoena to only those records required to be maintained by law. Both parties have also agreed that the subpoena shall remain in effect until complied with or quashed.

## II. Discussion

Federal Rule of Criminal Procedure 17(c) provides, "The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive." Both Petitioners here assert two arguments that the subpoena is unreasonable or oppressive: first that the scope of the subpoena is "overbroad" and second that it violates Petitioners' Fifth Amendment Rights.

### A. Scope of Subpoena

■ Grand jury proceedings are "entitled to a presumption of regularity ... [the party] challenging a grand jury subpoena has the burden of showing irregularity." *Grand Jury Proceedings: Subpoenas Duces Tecum*, 827 F.2d 301, 304 (8th Cir. 1987) (subpoena upheld that requested records limited in time and scope and relevant to the investigation). The grand jury rightfully has access to records for which the

---

1. A subpoena, revised for technical changes, but requesting the same information was agreed to by both parties and is found as the Government's *Exhibit A in its Memorandum in Opposition to Quash/Modify Subpoena Under Fed. R.Crim.P.* 17(c).

Government can make a minimal showing of general relevance. *Id.* at 306.

■ In the instant case, this Court finds that Petitioners have not met their burden to show irregularity and that the Government has made its showing of minimal relevance. Petitioners make only vague and conclusory statements of overbreadth in their motion, and they do not brief the issue. (*See* Spano's Motion to Quash/Modify at ¶ 2; Parkside's Motion to Quash/Modify at ¶ 2). On the other hand, the Government has shown that the subpoenas at issue cover a limited time (a five year period) and they seek records relevant to the investigation into odometer tampering (Petitioners' business records and odometer records). (*See* discussion *infra* at B.1. for a detailed analysis of the records requested). This Court is entirely without any factual basis on which to base an order to quash/modify on overbreadth grounds, therefore Petitioners' motions on these grounds are both denied.

### B. Fifth Amendment Privilege

The privilege against self-incrimination is protected under the Fifth Amendment to the United States Constitution which provides, "No person ... shall be compelled in any criminal case to be a witness against himself."

The Supreme Court has said that the Fifth Amendment privilege is rooted in:

> [O]ur unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load;' ... our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter

to the guilty,' is often a 'protection to the innocent.'

*Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596–97, 12 L.Ed.2d 678 (1964) *quoting* 8 J. Wigmore, *Evidence* § 2251 at 317 (McNaughton rev. ed. 1961); *Quinn v. United States,* 349 U.S. 155, 162, 75 S.Ct. 668, 673, 99 L.Ed. 964 (1955) (citations omitted). The instant case presents the question of whether the privilege applies equally to a sole proprietor and a sole shareholder of a corporation.

### C. Sole Proprietor's Fifth Amendment Privileges—Petitioner Spano

■ An individual may refuse to comply with a subpoena duces tecum seeking personal records by asserting the Fifth Amendment's privilege. *See Boyd v. United States,* 116 U.S. 616, 634–35, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886) (finding that "a compulsory production of the private books and papers" of a person constitutes compelling him "to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution"); *see also Bellis v. United States,* 417 U.S. 85, 87, 94 S.Ct. 2179, 2182, 40 L.Ed.2d 678 (1974) ("It has long been established ... that the Fifth Amendment privilege against compulsory self-incrimination protects an individual from compelled production of his personal papers and effects as well as compelled oral testimony."). A sole proprietor is treated as an individual, not a representative of a collective entity, for Fifth Amendment purposes. *Braswell v. United States,* 487 U.S. 99, 124, 108 S.Ct. 2284, 2298, 101 L.Ed.2d 98 (1988) (Kennedy, J., dissenting).

#### 1. Required Records Exception

■ However, where the documents sought by the subpoena are not personal, but rather are "required records," then even an individual or sole proprietor may be compelled, under specific circumstances, to produce them. *Shapiro v. United States,* 335 U.S. 1, 33, 68 S.Ct. 1375, 1392, 92 L.Ed. 1787 (1948) (the privilege which exists as to private papers cannot be maintained in relation to 'records required by law' in order to ensure that there is suit-

able information about transactions which are the appropriate subjects of governmental regulation) *quoting Wilson v. United States,* 221 U.S. 361, 380, 31 S.Ct. 538, 544, 55 L.Ed. 771 (1911). Required records which are excepted from Fifth Amendment privileges are only those records which satisfy a three part test enunciated in *Grosso v. United States,* 390 U.S. 62, 67–68, 88 S.Ct. 709, 713, 19 L.Ed.2d 906 (1968). First, the purposes of the Government's inquiry must be essentially regulatory (rather than criminal) in nature. *Id.* Second, the records must contain the type of information that the regulated party would ordinarily keep. *Id.* Third, the records, "must have assumed 'public aspects' which render them at least analogous to public documents." *Id. interpreting Shapiro,* 335 U.S. at 1, 68 S.Ct. at 1375.

In the instant case, the Government has agreed to limit the subpoena to "only those records that Spano was required by law to maintain." (Gov't Supp. Memo at 1). Notwithstanding this agreement, this Court must first determine whether the contents of the requested documents meet the *Grosso* standards for the required records exception.

The following subpoenaed records are those which, the Government argues, Spano was required by law to maintain: a) federal and state tax returns requested in ¶ 3 of the subpoena and required under 26 U.S.C. § 6011(a) and Mass.Gen.L. ch. 62C, §§ 8 & 10 (1991), respectively; b) W–2 forms requested in ¶ 3 and required under 26 U.S.C. § 6011(a); c) unemployment insurance records and worker's compensation records requested in ¶ 3 and required under Mass.Gen.L. ch. 151A, § 45 & ch. 152 § 22 (1991); d) automobile licensing records requested in ¶ 4, including bookkeeping ledgers, journals etc. requested in ¶ 5, under Mass.Gen.L. ch. 140 §§ 59 & 62 (1991) and Massachusetts state law requiring the licensing and titling of automobiles, Mass. Gen.L. ch. 90 § 2 (1991); and e) odometer statements requested in ¶ 8(a) of the subpoena and required under 15 U.S.C. § 1988, 49 C.F.R. § 580.8. Each of these is considered *seriatim.*

a. Federal and State Tax Returns.

■ This Court finds that the required records exception applies to the income tax records requested in the subpoena. Tax return records are clearly required for regulatory—as opposed to criminal purposes. *Accord Heligman v. United States,* 407 F.2d 448, 451–52 (8th Cir.) (the purpose of tax laws is to raise public funds, not to punish crimes) *cert. denied,* 395 U.S. 977, 89 S.Ct. 2129, 23 L.Ed.2d 765 (1969). Second, federal and state tax returns contain the type of information that the regulated party would ordinarily keep. An individual business owner will normally keep records showing the amount of sales she makes and the cost of producing those sales including expenses and overhead for management purposes. While a tax return requires the keeping of additional information peculiar to the tax code (depreciation calculations, for example) the mere existence of that information on the tax return does not indicate that the tax code was enacted for a constitutionally impermissible Governmental inquiry. Third, the tax returns have assumed public aspects which render them at least analogous to public documents. This third *Grosso* factor does not mean that the records must be available for public viewing, rather it has been interpreted to mean, for example, that the records are the sort which must be submitted to a public agency. *See In re Dr. Doe,* 711 F.2d 1187, 1192 (2d Cir.1983) (public aspect of drug prescription evidenced by the fact that the record must be forwarded to the state health department). *Accord In re Grand Jury Empanelled March 19, 1980,* 541 F.Supp. 1 (D.N.J.1981), *aff'd,* 680 F.2d 327 (3d Cir.1982), *aff'd* in part, *rev'd* in part on other grounds *sub nom. United States v. Doe,* 465 U.S. 605, 608 n. 3, 104 S.Ct. 1237, 1240 n. 3, 79 L.Ed.2d 552 (1984); *Resolution Trust Corp. v. Lopez,* 794 F.Supp. 1, 4 (D.D.C.1992) (the court notes that it "remain[s] unpersuaded that income tax returns are protected by the Fifth Amendment privilege.").

b. W–2 forms and;

c. Unemployment insurance records and worker's compensation records requested in ¶ 3. (Hereinafter, payroll records).

■ This Court has little difficulty applying the required records exception to the payroll records requested in the subpoena. Here, the payroll records are clearly required for regulatory—as opposed to criminal prosecutorial purposes. Second, the payroll records obviously contain the type of information that the regulated party, here a sole proprietor, would ordinarily keep. Third, the payroll records have assumed public aspects which render them at least analogous to public documents; e.g., the records are the sort which must be submitted to a public agency under Mass. Gen.L. ch. 62C §§ 8, 10 (1991); Mass. Gen.L. ch. 151A § 45 (1991), for example. *Accord In re Dr. Doe*, 711 F.2d at 1191 (holding that W-2's are required records).

d. Automobile licensing records requested in ¶ 4—including bookkeeping ledgers, journals etc. requested in ¶ 5.

■ Massachusetts law requires automobile dealers to keep certain licensing and business records. *See e.g.*, Mass.Gen.L. ch. 140 §§ 59 & 62 (1991) and Mass.Gen.L. ch. 90 § 2 (1991). This Court concludes that while the licensing and titling records the Government seeks are required records, some of the bookkeeping ledgers and journals requested in ¶ 5 are not.

Under *Grosso*, this Court concludes that the purposes of the aforementioned Massachusetts statutes are regulatory in nature, as opposed to criminal. For example, Mass.Gen.L. ch. 140 § 62 requires an automobile dealer to maintain a "record book" on the premises which records chain of title information regarding the purchase or sale

of automobiles and or parts of automobiles.[2] This information serves a number of regulatory, e.g., health and public safety purposes. For example, it enables chain of title to be traced in the not infrequent event of a manufacturer recall.

Second, it is manifest that these licensing and business records contain the type of information the regulated party would normally keep. If, for example a customer claimed that a dealer was liable for injuries obtained in that dealer's automobile, the dealer would need records to identify that particular automobile. It is the third prong of the *Grosso* test where the bookkeeping records diverge from the licensing and titling records.

Under the third *Grosso* factor, the records must have assumed public aspects which render them at least analogous to public documents. As described *supra*, this last factor does not mean that the records must be available for public viewing, rather it may simply mean that the records are the sort which might be submitted to a public agency or otherwise imbued with a public aspect.

Here, the Court finds that while this, and all the other *Grosso* factors are satisfied as to Spano's licensing, revenue and transportation agency documents, the same cannot be said with respect to all the information requested in ¶ 5. Paragraph 5 seeks, "All ledgers and journals used in connection with any of your motor vehicle businesses (including but not limited to, books of registry, police books, used car record books, general and subsidiary ledgers, sales journals, inventory journals, cash receipts journals, cash disbursements journals, and voucher registers." Bookkeeping records, i.e., the general and subsidiary ledgers,

---

**2.** In pertinent part, the statute requires:

**Record book; contents**

Every [automobile dealership] licensee shall keep a book on the licensed premises, in such form as shall be approved by the registrar, in which, at the time of the purchase, sale, exchange, or receipt for the purpose of sale, of any second hand motor vehicle or parts thereof, shall be legibly written in the English language an account and description of such motor vehicle or parts, with the name and address of the seller, of the purchaser, and of

the alleged owner or other person from whom such motor vehicle or parts were purchased or received or to whom they were delivered, as the case may be. Such description, in the case of motor vehicles, shall also include the identifying number or numbers required by the registrar, and shall also include a statement that the identifying number or numbers have been removed, defaced, altered, changed, destroyed, obliterated or mutilated if such is the fact.

Mass.St. 140 § 62 (1991).

cash receipts journals, cash disbursements journals, and sales journals, of a privately-owned company are not the sort of records provided to public agencies, available for public viewing, or otherwise imbued with public aspects that would satisfy this *Grosso* prong.[3] While bookkeeping records are exceedingly common, virtually indispensable for tax return preparation, and while most businesses keep them, the Government has made an insufficient showing that these bookkeeping records are "required records."[4] Thus, the general and subsidiary ledgers, cash receipts journals, cash disbursements journals, and sales journals requested in ¶ 5 fail to meet the *Grosso* test and are not required records.

 e. Odometer statements requested in ¶ 8(a).

■ This Court finds that the odometer statements requested are *required records* since all three *Grosso* factors are met.

First, the purpose of the odometer requirements statute is regulatory, and not criminal in nature. The Congressional purpose of the Motor Vehicle Information and Cost Savings Act is stated in 15 U.S.C. § 1981 as follows:

**Congressional findings and declaration of purpose.**

The Congress finds that purchasers, when buying motor vehicles, rely heavily on the odometer reading as an index of the condition and value of such vehicle; that purchasers are entitled to rely on the odometer reading as an accurate reflection of the mileage actually travelled by the vehicle; that an accurate indicia of the mileage travelled by a motor vehicle assists the purchaser in determining its safety and reliability....

Under 15 U.S.C. § 1990d Congress set out certain odometer record keeping requirements to effectuate the purposes of the Act.[5] The Secretary of Transportation promulgated rules pursuant to the Act requiring, for example, that mileage disclosure must be made in writing each time that title to a vehicle is transferred. 49 C.F.R. 580.5(a). Accordingly, it is clear that these record keeping requirements support the overall regulatory purpose of the Act and satisfy the first *Grosso* factor.

Second, the odometer records obviously contain the type of information that the regulated party, an automobile dealer, would ordinarily keep. An automobile dealer would ordinarily want to know the mileage on a vehicle for purposes of pricing the vehicle for resale. Used vehicle values are routinely computed based on a number

---

3. The Government urges that Mass.Gen.L. ch. 140 § 66 provides authority that an automobile dealer's "books" are required records. That statute merely allows for entry and inspection of books, it does not mandate the creation of any particular records. The statute (before July, 1992) provides in pertinent part:

 § 66. **Entering premises; investigation; examination of vehicles; parts, books, papers and inventories**
 The commissioner of public safety, the attorney general or such persons as he may designate, the police commissioner in Boston, the chief of police of any other city, the selectmen of a town or any police officer authorized by any of said officials, or any person having police powers under section twenty-nine of chapter ninety may at any time enter upon any premises used by any person licensed under section fifty-nine for the purpose of carrying on his licensed business, ascertain how he conducts the same, and examine all second hand motor vehicles or parts thereof kept or stored in or upon the premises, and all books, papers and inventories relating thereto.

Ma.Gen.L. ch. 140 § 66 (1991).

4. A different result might obtain if Spano were a corporation since virtually all corporations are required to keep books of account available for inspection by shareholders. The Government has not, however, demonstrated that Spano is under any like requirement.

5. Sec. 1990d(b) provides, in pertinent part, as follows:

 [E]ach dealer or distributor shall—
 (1) maintain such records as the Secretary may reasonably require ...
 (2) permit an officer or employee duly designated by the Secretary ... to inspect appropriate books, records, and documents relevant [to determining compliance with the Act] ...
 (3) provide such officer or employee information from records required....
 Nothing in this subsection authorizes the Secretary to require dealers or distributors to provide information on a regular periodic basis.

of factors—one of the most important of which is mileage travelled. (*See, e.g.*, National Automobile Dealer's Association "Blue Book," published monthly.) Third, the odometer records here have assumed public aspects which render them at least analogous to public documents. While they are not the sort which must be submitted to a public agency, they must nevertheless be available for agency review and must be provided to the automobile buying public with each sale. *Accord Grand Jury Subpoena Duces Tecum, Underhill*, 781 F.2d 64, 70 (6th Cir.1986) (holding that odometer records are required records), *cert. denied*, 479 U.S. 813, 107 S.Ct. 64, 93 L.Ed.2d 23 (1986).

Accordingly, this Court concludes that the aforementioned records are "required records" not subject to the Fifth Amendment privilege against self-incrimination with the exception of Petitioner Spano's general and subsidiary ledgers, cash receipts and cash disbursement journals, and sales journals. The inquiry doesn't end here, however, since the production of these required records *may be* privileged under the "act of production" doctrine.

## 2. Act of Production Doctrine

■ It is well settled that the act of producing documents is itself a communication protected by the Fifth Amendment, separate and distinct from the information contained within the documents. "The act of producing evidence in response to a subpoena ... has communicative aspects of its own, wholly aside from the contents of the papers produced." *Fisher v. United States*, 425 U.S. 391, 410, 96 S.Ct. 1569, 1581, 48 L.Ed.2d 39 (1976); *see also Curcio v. United States*, 354 U.S. 118, 125, 77 S.Ct. 1145, 1150, 1 L.Ed.2d 1225 (1957) ("The custodian's act of producing books or records in response to a subpoena duces tecum is itself a representation that the documents produced are those demanded by the subpoena."). The Supreme Court has stated that the act of producing documents can constitute testimonial communication protected by the Fifth Amendment because it may entail implicit statements of fact, "by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic." *Doe v. United States*, 487 U.S. 201, 209, 108 S.Ct. 2341, 2347, 101 L.Ed.2d 184 (1988) (hereinafter *Doe II*). "Production is the precise act compelled by the subpoena, and obedience, in some cases, will require the custodian's own testimonial assertions.... [T]he potential for self-incrimination inheres in the act demanded of the individual...." *Braswell*, 487 U.S. at 124, 108 S.Ct. at 2298.

What is not at all well settled is the intersection, if any, of the required records doctrine and the act of production doctrine. That is, even if the records in the instant case meet the *Grosso* required records test, may Spano refuse to produce them if his act of producing them would violate his privilege against compelled self-incrimination? This Court is persuaded that he may.

■ To invoke the act of production doctrine, Petitioner must demonstrate that the production is compelled, testimonial, and incriminating. *See United States v. Doe*, 465 U.S. 605, 610–12, 104 S.Ct. 1237, 1241–42, 79 L.Ed.2d 552 (1984) (hereinafter *Doe I*).

First, there is no question that a grand jury subpoena is compelled production. The second inquiry is whether the act of producing these required records is testimonial. Here, enforcement of a subpoena would compel the respondent to admit that the records exist or do not exist, that they are authentic, and that they are responsive to the subpoena. If, for example, the odometer records do not exist, Spano would be subject to civil and/or criminal fines. *See* 49 C.F.R. § 580.5. This Court is persuaded that these communications, inherent in the act of production, must be held to be testimonial unless the existence and authenticity of the requested documents is a "foregone conclusion," a doctrine discussed in the next section of this memorandum.[6] *Doe I*, 465 U.S. at 612, 104 S.Ct. at

---

**6.** Spano argues that he should be given opportu-

nity to show that his act of production would be

1242 ("A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect."); *Doe II*, 487 U.S. at 209, 108 S.Ct. at 2347 (a witness' act of producing documents "might entail implicit statements of fact ... [such as] would admit the papers existed, were in his possession or control, and were authentic.").

Lastly, Spano's act of producing these documents would be incriminating. If, as suggested *supra*, the odometer records do not exist and are therefore not produced, Petitioner Spano would subject to fines/ and or imprisonment.[7] *See* 49 C.F.R. § 580.5(d). Thus, unless the existence and authenticity of the records is a foregone conclusion, Petitioner Spano's act of producing them is protected under the Fifth Amendment.

The Government argues that the act of production doctrine is inapplicable where, as here, the documents sought are "required records." This Court does not agree, although we note that there is considerable confusion in the reported cases and among the commentators on this point.[8] The Government bases its position—that the act of production exception cannot be used to resist production of required records—largely on *Underhill*, 781 F.2d at 70.[9]

*Underhill* was a 1986 case, much like the instant case. It involved a sole proprietor of an automobile dealership who sought to quash a subpoena duces tecum on Fifth Amendment grounds under the act of production doctrine. The subpoena required him to produce odometer statements. *Id.* at 65. The *Underhill* court held that even though the act of producing the statements would be compelled, testimonial, and incriminating, that the records must nevertheless be produced, "[b]ecause in our view the contents, as well as the act of producing the odometer statements, come within the required records exception to the Fifth Amendment." *Id.* at 65 *citing Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948) (citations omitted). The *Underhill* court distinguished *Doe I* on grounds that *Doe I* dealt only with "business documents and records not required by law to be kept or disclosed to a public agency." *Underhill*, 781 F.2d at 69 *quoting Doe I*, 465 U.S. at 607 n. 3, 104 S.Ct. at 1240 n. 3.

This Court is persuaded that the *Underhill* court's position has subsequently been called into doubt by the Supreme Court's 1988 decisions in *Braswell* and *Doe II*.

In *Braswell*, the court was faced with the question of whether the owner of a

---

both testimonial and incriminating. (Spano's Memo at unpaginated 3). Our conclusion here obviates the need for him to show the that the act would be testimonial. Spano is likewise relieved of any burden to further show that his act of production would be incriminating as is more fully discussed *infra* in note 7 and the accompanying text.

Likewise, Spano's argument that he was compelled to produce the very documents which might incriminate him is also obviated. (*See* Spano's Memo at unpaginated 6). Moreover, the Court notes that to give effect to his logic, would be to overrule the entire required records exception to the Fifth Amendment—a leap this Court is not empowered to make in light of clear precedent to the contrary.

7. On the other hand, if the records do exist, then there is nothing incriminating in the act of producing them. Spano has asked for opportunity to show that the act of producing these documents would be incriminating. But in order to do so, Spano would have to demonstrate through testimony or *in camera* evidence, that

the records do not exist—which is in itself incriminating. Thus, in a case such as this, where the existence or non-existence of records itself is a crime, Petitioner need not, in fact, cannot be required to make any further showing that the act of production would be incriminating.

8. *See e.g.,* Paul S. Diamond, *Federal Grand Jury Practice And Procedure* 231 (1990) ("The close vote in *Braswell* and the many unresolved issues that remain ensure that the Supreme Court, after allowing the lower courts some time to grope for resolutions, will visit the subject [of the act of production] again.").

9. The Government cites other cases for its proposition, however, like *Underhill*, all but two of the cases (*Baltimore City Department of Social Services v. Bouknight*, 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990) and *United States v. Lehman*, 887 F.2d 1328, 1332 (7th Cir.1989)) pre-date *Braswell*. *Bouknight* is factually distinguishable from the instant case. *Lehman*, while persuasive, is not binding on the courts of the Eighth Circuit.

closely-held corporation could assert a Fifth Amendment privilege and avoid producing a number of corporate records—including records normally considered "required." [10] *Braswell,* 487 U.S. at 103, 108 S.Ct. at 2287. The Court, after examining the origins of the act of production doctrine, stated, "Had petitioner [Braswell] conducted his business as a sole proprietorship, *Doe* [I] would require that he be provided the opportunity to show that his act of production would entail testimonial self-incrimination." *Id.* at 104, 108 S.Ct. at 2288. This statement is inapposite to the Sixth Circuit's position in *Underhill* that the act of production doctrine "is not applicable to required records." *Underhill,* 781 F.2d at 69. The Seventh Circuit followed *Underhill* in a post-*Braswell* decision, *United States v. Lehman,* 887 F.2d 1328, 1332 (7th Cir.1989) (the required records doctrine held intact after *Doe I* and *Fisher* ).

Notwithstanding the pre-*Braswell* position of the Sixth Circuit and the post-*Braswell* position of the Seventh Circuit, this Court finds that the logic of *Underhill* is unpersuasive in light of *Braswell.* This Court is not bound to follow either the Sixth or Seventh Circuit decisions. Accordingly, since the Eighth Circuit has not yet spoken on the matter, this Court heeds *Braswell* 's dicta which indicates that a sole proprietor may invoke the Fifth Amendment privilege with respect to required records under the act of production doctrine upon a showing that the act would be both incriminating and testimonial.

**10.** The subpoena requested: receipts and disbursement journals; general ledger and subsidiaries; accounts receivable/accounts payable ledgers, cards, and all customer data; bank records of savings and checking accounts, including statements, checks, and deposit tickets; contracts, invoices—sales and purchase—conveyances, and correspondence; minutes and stock books and ledgers; loan disclosure statements and agreements; liability ledgers; and retained copies of Forms 1120, W–2, W–4, 1099, 940 and 941.

**11.** It is thus apparently now true that there are no business records that an individual can make whose *contents* would be privileged *per se.* If

*A fortiori,* the bookkeeping records identified *supra* as failing to meet the *Grosso* "required records" test are subject to this same *Doe I* standard. *Doe I* instructs that the contents of business documents voluntarily prepared are not privileged, but that the act of producing them may be. *Doe I,* 465 U.S. at 610–12, 104 S.Ct. at 1241–42.[11] Petitioner Spano does not assert that any of these bookkeeping records, if they exist, were involuntarily prepared. Thus, Spano, in order to assert the Fifth Amendment privilege with respect to the act of producing these records, must show that to do so would be both testimonial and incriminating. Spano's instant motion failed to do so, but requested an opportunity to do so. This Court will allow Spano ten days from the date of this Order to make a showing that the act of producing his voluntarily prepared business documents would be both testimonial and incriminating.

### 3. Foregone Conclusion Doctrine

Even if Petitioner's act of production is incriminating, he may not avoid producing the documents if their existence and authenticity are a foregone conclusion. *Fisher,* 425 U.S. at 411, 96 S.Ct. at 1581 (holding that a taxpayer's production of his accountant's workpapers was not testimonial because their existence and authenticity were a foregone conclusion). The rationale of the foregone conclusion doctrine is that there is nothing testimonial about the respondent's act of production if the existence and authenticity of the records are known. In the instant case there is no indication that the Government is aware of

the records are "required records," their content is excepted from the Fifth Amendment under *Shapiro* and its progeny. If the records are voluntarily maintained, e.g., not required records, their content is not privileged under *Doe I.* Accord *In re Proceedings Before August 6, 1984 Grand Jury,* 767 F.2d 39, 41 (2nd Cir.1985). Thus, the lone constitutional protection that a sole proprietor now has against self-incrimination by virtue of his own business records, is the act of production doctrine. This is all the more reason that this Court is not persuaded by the positions of the Sixth and Seventh Circuits—that the act of production doctrine is inapplicable to the required records exception.

the existence or location or authenticity of any of the subpoenaed documents. The foregone conclusion doctrine is therefore unavailable to defeat Petitioner Spano's Fifth Amendment privilege under the act of production doctrine.

In summary with respect to Petitioner Spano: this Court finds that while the subpoena requested documents that were principally, required records whose contents are excepted from the Fifth Amendment's privilege against self-incrimination, that the act of producing those documents would entail communications that are both testimonial and incriminating and are therefore privileged under the United States Constitution, amendment V.[12] With respect to Petitioner Spano's voluntarily prepared business records; e.g., the bookkeeping records identified *supra* as not required records, Petitioner Spano will be ordered to comply with the subpoena absent an adequate showing within ten (10) days of the date of this order, that production of the bookkeeping records would be both testimonial and incriminating under *Doe I.*

### III. Closely–Held Corporation's Fifth Amendment Privileges—Petitioner Parkside

■ Although the Fifth Amendment privilege protects individuals, it is well settled that the privilege has no application to collective entities such as corporations. *See Hale v. Henkel,* 201 U.S. 43, 74, 26 S.Ct. 370, 378–79, 50 L.Ed. 652 (1906). An individual cannot assert his personal privilege in order to defeat a subpoena for corporate records, even if the records contain information incriminating him, and even if the documents were drafted by him in his capacity as a corporate officer. *Bellis v. United States,* 417 U.S. at 88–89, 94 S.Ct. at 2183–84; *United States v. White,* 322 U.S. 694, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1944); *Fisher v. United States,* 425 U.S. 391, 410 n. 11, 96 S.Ct. 1569, 1580 n. 11, 48 L.Ed.2d 39 (1976) (stating that "[t]he fact that the documents may have

been written by the person asserting the privilege is insufficient to trigger the privilege").

■ The Supreme Court's most recent pronouncement in *Braswell v. United States,* 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988) confirmed these collective entity principles in the specific context of a closely-held business, but purportedly left open the precise set of facts implicated in the case sub judice:

> We leave open the question whether the agency rationale supports compelling a custodian to produce corporate records when the custodian is able to establish, by showing for example that he is the sole employee and officer of the corporation, that the jury would inevitably conclude that he produced the records.

*Id.* at 118–19 n. 11, 108 S.Ct. at 2295 n. 11. Petitioner Parkside argues that the instant case falls within *Braswell's* open question and that this Court should not apply *Braswell* because,

> As the corporations [sic] only individual member, Connor, [sic] can only be a [sic] custodian who is incriminated by the personal knowledge he communicates in locating and selecting the documents requested by the Grand Jury [sic] and will be compelled to testify in the most elemental constitutional sense.

(Parkside Memo at page 4). Parkside also urges that because Connor is the sole shareholder, incorporator, and sole present employee of Parkside, that to treat Parkside as a corporation rather than an individual in this matter is to elevate form over substance. (Parkside Memo at 3).

What Parkside implicitly urges is that the act of production doctrine should be applied to Francis Connor, the corporation's "custodian of records," and thereby prohibit the production of corporate records. This Court cannot, consistent with principles of stare decisis, agree with Parkside's position.

---

**12.** This disposition obviates the need to consider the Government's argument that Spano should also be required to provide "ancillary testimony" about the subpoenaed documents.

## A. *Braswell*

In *Braswell,* the Supreme Court held that a custodian of corporate records may not resist a subpoena for corporate records on the ground that the act of production will incriminate him in violation of the Fifth Amendment. *Braswell v. United States,* 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988). *See also In re Grand Jury Subpoena 85–W–71–5,* 784 F.2d 857 (8th Cir. 1986) (*Doe I* act of production doctrine is not applicable to corporations and did not implicitly overrule the collective entity doctrine). This Court is bound to apply *Braswell* to the instant case.

The *Braswell* court reasoned that a custodian of business records is the representative of a collective entity, the corporation, and acts as the corporation's agent in producing corporate business records:

> [T]he Court has consistently recognized that the custodian of corporate or entity records holds those documents in a representative rather than a personal capacity. Artificial entities such as corporations may act only through their agents, and a custodian's assumption of his representative capacity leads to certain obligations, including the duty to produce corporate records on proper demand by the Government. Under those circumstances, the custodian's act of production is not deemed a personal act, but rather an act of the corporation. Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation—which of course possesses no such privilege.

*Id.* at 109–10, 108 S.Ct. at 2291 (citation omitted). The Supreme Court in *Braswell* stated that if the petitioner had conducted his business as a sole proprietorship—as discussed *supra* with respect to Petitioner Spano—*Doe I* would require that he be provided the opportunity to show that his act of production would entail testimonial self-incrimination as to admissions that the records existed, were in his possession, and were authentic. *Braswell,* 487 U.S. at 104, 108 S.Ct. at 2288. However, because the official records of a business organization are held by a custodian of records in a representative rather than a personal capacity, production of the records cannot be the subject of a personal privilege against self-incrimination even though the contents of the records might tend to incriminate the custodian personally. *Id.* at 107, 108 S.Ct. at 2289. The court found that the "corporate entity doctrine" applied regardless of the corporation's size, *Id.* at 108, 108 S.Ct. at 2290, and regardless of whether the subpoena was issued to the custodian of records of the corporation or to a specific individual within the corporation.

Notwithstanding the *Braswell* court's footnote that the question of Fifth Amendment privileges was left open where there was a sole shareholder/employee, the facts of *Braswell* are analogous to the instant case—thus the holding of *Braswell* is binding upon this Court.

Like Petitioner Parkside in the instant case, Braswell sought to avail himself of the Fifth Amendment's protection arguing that his business entity was really his alter ego and that producing the documents requested would incriminate him. Braswell produced substantial evidence at trial showing that his corporation had no identity apart from his own. For example, Braswell introduced evidence that:

(1) Randy Braswell owned, and had always owned 100% of the stock of the active corporation.

(2) The corporation had only one employee other than Randy Braswell, his sister-in-law who was a secretary.

(3) Braswell's authority over the corporation was 'absolute, total, [and] complete.'

(4) Braswell had no personal checking account, only the corporate one.

(5) Braswell's personal expenses, and those of his wife, were paid out of the corporate checking account.

(6) Randy Braswell was the only individual with the authority to act on behalf of the corporation, and the only person who ever acted on behalf of the corporation.

(7) Braswell had total control over the contents of the records of the business.

(8) The records reflect all of Braswell's financial transactions, personal as well as business.

(9) The credit cards used by Braswell and his wife for personal expenditures were in the name of the corporation.

(10) No bank loans to the corporation were ever made by Braswell's primary banker, without Braswell's personal guarantee. (Brief for Petitioner at 5–6, *Braswell v. United States*, 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988). Braswell also introduced evidence that he incorporated his sole proprietorships merely for the sake of appearance. *Id.*

In the instant case, the corporate fiction is not significantly different than under the facts of *Braswell.*

The organizational differences between Braswell's corporation and Connor's corporation, Parkside, are: 1) Braswell, like Connor in the instant case, was the sole shareholder; 2) Braswell's corporation had two figurehead officers, his sister and his mother. Parkside Motors, Inc. has only one officer—Connor himself. 3) Braswell's corporation had one other employee, his sister-in-law who performed secretarial work. Connor's corporation claims it "presently" has no "employees," but it is apparently uncontested that Parkside had employees during the period covered by the subpoena. Moreover, the Government has provided evidence that Parkside, Inc. presently has two "agents" who are authorized to buy and sell cars at auction. (Gov't Supp. Memo, Exhibit 1).

This Court is persuaded that given the factual similarities between Braswell and Connor, that the *Braswell* decision is binding and therefore Parkside, Inc. may not avoid producing the subpoenaed records on grounds of Fifth Amendment privilege. The footnote in *Braswell* upon which Petitioner Parkside relies, itself supports this result. The footnote conditioned its "open question" upon circumstances in which, "the jury would inevitably conclude that he [the sole shareholder and sole employee] produced the records." *Braswell*, 487 U.S. at 118–19 n. 11, 108 S.Ct. at 2295 n. 11. Here, the Government has produced credi-

ble evidence that Parkside presently has two agents, and has had agent/employees authorized, in writing, to buy and sell cars for the company. Parkside maintains that these agents, Frank Rocco and James Barnes, are not "employees," and that their duties were limited by time and task. A jury would not thus inevitably conclude that Connor had produced the records, since it would also be possible for the jury to conclude that his agents/employees had done so. The very existence of this factual dispute over the nature and scope of Rocco's and Barnes' agency suggests that a jury would not be lead to an **"inevitable"** conclusion regarding the act of producing the subpoenaed records. Absent such an inevitable conclusion, the holding in *Braswell* must be applied.

B. Auxiliary Testimony

 The Government argues that Connor should be required to provide testimony "ancillary" to the production of the requested records. (Gov't Supp. Memo at 3).

The leading case of *United States v. Austin–Bagley Corp.*, 31 F.2d 229, 234 (2nd Cir.), *cert. denied*, 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002 (1929), explained the scope and limitation of the "auxiliary to production" doctrine. In that case, the secretary-treasurer of a corporation, who was charged with conspiracy to violate the National Prohibition Act, was called to the stand by the Government and compelled to identify the minutes of the corporation. Circuit Judge Learned Hand, for the Court of Appeals upheld this procedure, stating:

> That the production of the books and documents could be compelled, even if they contained entries incriminating the accused, is now well-settled law. . . . However, the availability of the documents does not necessarily determine that of the testimony by which they may be authenticated. Conceivably it might be possible to force their production and yet their possessor be protected from proving by his oath that they were what they purport to be. . . . While, therefore, we do not disguise the fact that there is here a possible, if tenuous, distinction, we think that the greater includes the

less, and that, since the production can be forced, it may be made effective by compelling the producer to declare that the documents are genuine.... Hence it appears to us that the case [*Heike v. United States*, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913)] determines that testimony auxiliary to the production is as unprivileged as are the documents themselves. By accepting the office of custodian the holder not only exposes himself to producing the documents, but to making their use possible without requiring other proof than his own.

*Austin–Bagly*, 31 F.2d at 223–34.

The *Braswell* Court reaffirmed this principle, "The custodian's act of producing books or records in response to a subpoena duces tecum is itself a representation that the documents produced are those demanded by the subpoena. Requiring the custodian to identify or authenticate the documents for admission in evidence merely makes explicit what is implicit in the production itself." *Braswell*, 487 U.S. at 114, 108 S.Ct. at 2293 *quoting Curcio v. United States*, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957). *Braswell* thus indicated that the petitioner would have no right to refuse to fulfill his obligation as records' custodian to identify and authenticate the documents produced.

Because the custodian of corporate records is acting in a representative rather than a personal capacity, he is protected against the future evidentiary use of his testimony ancillary to the act of production. The Court in *Braswell* stated:

Because the custodian acts as a representative, the act is deemed one of the corporation and not the individual. Therefore, the Government concedes, as it must, that it may make no evidentiary use of the "individual act" against the individual. For example, in a criminal prosecution against the custodian, the Government may not introduce into evidence before the jury the fact that the subpoena was served upon and the corporation's documents were delivered by one particular individual, the custodian. The Government has the right, however, to use the corporation's act of production against the custodian. The Government may offer testimony—for example, from the process server who delivered the subpoena and from the individual who received the records—establishing that the corporation produced the records subpoenaed. The jury may draw from the corporation's act of production the conclusion that the records in question are authentic corporate records, which the corporation possessed, and which it produced in response to the subpoena. And if the defendant held a prominent position within the corporation that produced the records, the jury may, just as it would had someone else produced the documents, reasonably infer that he had possession of the documents or knowledge of their contents. Because the jury is not told that the defendant produced the records, any nexus between the defendant and the documents results solely from the corporation's act of production and other evidence in the case.

*Braswell*, 487 U.S. at 118, 108 S.Ct. at 2295.

Thus, in the present case, under the logic of *Braswell*, Connor's testimony, as custodian of corporate records, concerning the fact that the records were regularly kept in the course of a regularly conducted activity, would not be able to be used in a possible subsequent prosecution against Connor to incriminate him personally. The jury in a subsequent trial would not be told that it was Connor who produced and gave the limited testimony needed to authenticate the business records in the present case. The existence of the records could be used, however, against the corporation, Parkside Motors, Inc., and it would be Connor's position in the corporation, which would have to be established independently, that would incriminate him, not his production or testimony concerning the records.

For these reasons, this Court is persuaded that in the circumstances of the present case, Connor, as the custodian of corporate records of Parkside Motors, Inc., does not have a Fifth Amendment privilege to refuse to authenticate the corporate records

which he produces in response to the Government's subpoena.

This Court's decision highlights an anomaly that, we suspect, would puzzle the drafters of the Constitution: that by virtue of their respective choice of business organization, one small business owner may avail himself of the protection against self-incrimination embodied in the Fifth Amendment to the United States Constitution and the other may not. As Justice Kennedy warned in his *Braswell* dissent, such a result "gives the corporate agent fiction a weight it simply cannot bear." *Braswell,* 487 U.S. at 128, 108 S.Ct. at 2300 (Kennedy, J., dissenting).

